[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 24-11500

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

SHAQUANDRA WOODS,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 4:22-cr-00016-RSB-CLR-1

————————————————

Before ROSENBAUM, LAGOA, and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, Shaquandra Woods appeals her conviction and 75-month prison sentence for conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.  Woods argues that the district court: (1) plainly erred by permitting a material variance between the single-conspiracy indictment and the trial evidence of multiple conspiracies; (2) abused its discretion by admitting a co-conspirator's testimony about a threat Woods made; and (3) erroneously calculated Woods's advisory guidelines range. After careful review, we affirm Woods's conviction and sentence.

## I.  BACKGROUND

### A.    Woods's Offense Conduct

During the COVID-19 pandemic, Woods, an attorney, fraudulently applied for, or helped friends and family members fraudulently apply for, emergency business loans.

Under the Coronavirus Aid Relief and Economic Securities ("CARES") Act, the Small Business Administration ("SBA") funded two loan programs: (1) the Economic Injury Disaster Loans ("EIDL") and (2) the Paycheck Protection Program ("PPP").  Both programs required that (1) the borrowing business be in operation before a certain date in 2020 and (2) that the loan amount be based on its gross revenue for the twelve months preceding the pandemic.

The trial evidence connected Woods to twelve loan applications, eleven of which were fraudulent.[1] Specifically, Woods submitted four EIDL loan applications for businesses she solely owned, including S.A. Woods Law, PLLC; EZE Trace, LLC; EZ Legal Solutions, LLC; and S.A. Woods Enterprise, LLC. Woods also submitted three PPP loan applications for her businesses.

Woods also helped submit EIDL applications for: (1) COVID Trucking, LLC, owned by her husband Quentin Bostick, Sr.; (2) Actually Living Life Management Consulting, LLC, owned by her friend Cleopatra Smith; (3) D'Evils Limited Co., owned by her husband's nephew, Jeremial Coleman; (4) an unincorporated sole proprietorship, owned by her cousin Kenneth Jackson; and (5) an unincorporated sole proprietorship, owned by her friend Courtney Gilchrist.

In broad outlines, Woods's fraud involved creating sham businesses, falsely reporting those businesses were in operation prior to the pandemic, reporting false revenue for the businesses to maximize the loan amount, and creating and submitting false supporting documentation, including bank statements, corporate documents, and tax records. Woods also recruited other participants to apply for loans and, for a fee, submitted their applications and other paperwork and either communicated

---

[1] The government conceded that Woods's first loan application in April 2020 for an EIDL loan of $6,500 for her law practice, S.A. Woods Law, PLLC, was not fraudulent.

directly with the SBA or the third-party lender on their behalf or coached the applicants on how to do so.

Woods also worked with her tax preparer, Amber Childers, and Woods's cousin Ashlee Parker, an accountant with her own tax business, to create false documents that Woods submitted in support of fraudulent loan applications.

## B.    Indictment

In a second superseding indictment, a federal grand jury charged Woods with: (1) conspiring with others "known and unknown" to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count 1); (2) four counts of making and presenting false, fictitious, or fraudulent claims to the SBA, in violation of 18 U.S.C. §§ 287 and 2 (Counts 2-5); and (3) two counts of knowingly making and using false writings and documents, in violation of 18 U.S.C. §§ 1001(a)(3) and 2 (Counts 6 and 7).

With respect to the wire fraud conspiracy charged in Count 1, the second superseding indictment alleged that Woods and her co-conspirators agreed "to obtain monies and funds owned by and under the custody and control of the Small Business Administration by means of false and fraudulent pretenses, representations, and promises."  The indictment alleged that the objects of the conspiracy were for the conspirators "to enrich themselves by obtaining EIDL proceeds unlawfully" and for Woods "to enrich herself by charging fees to EIDL applicants for completing and submitting their EIDL applications, which applications [Woods] knew to be fraudulent."

As to manner and means, the indictment alleged that Woods (1) "would complete and submit online EIDL applications for businesses purportedly owned by her and by others;" (2) "would falsely assert in the applications that the businesses were in existence prior to January 31, 2020;" (3) "would falsely and fraudulently inflate and misrepresent in the applications the businesses' gross revenues in the 12 months preceding January 31, 2020;" (4) "would enlist the assistance of co-conspirators to create false and fraudulent tax documents for submission to the SBA in support of the false and fraudulent applications;" (5) "would enlist the assistance of co-conspirators to call the SBA and falsely represent themselves as an applicant's employer and convey false information to the SBA in support of the false and fraudulent applications;" and (6) "would charge applicants approximately 10% of any funded EIDL as a fee for her services."

Woods entered a not guilty plea.

## C.    **Pretrial** *Motion in Limine*

Pretrial, Woods filed a motion *in limine* to prevent Parker, Woods's cousin and co-conspirator, from testifying about a statement Woods made to Parker. Woods told Parker she believed Gilchrist was cooperating with government investigators. Woods also told Parker that Woods's brother-in-law could "get rid of" Gilchrist, another co-conspirator. Parker interpreted Woods's statement to mean Woods could have Gilchrist killed. The district court denied Woods's motion.

The district court explained that evidence of a defendant's statement threatening a potential government witness was regularly admitted as evidence of a defendant's consciousness of guilt, knowing participation in criminal activity, and lack of mistake when engaging in criminal activity. The district court found that, while threat evidence is prejudicial, its probative value was not outweighed by any unfair prejudice.

The district court granted the government's motion to dismiss Counts 2 through 7. Count 1 went to trial.

### D.    Trial on Count 1 (**Wire Fraud Conspiracy**)

During a four-day trial, the government introduced many exhibits and the testimony of five co-conspirators—Smith, Gilchrist, Childers, Parker, and Coleman—and Agent Justin Lott from the SBA Office of the Inspector General. Agent Lott investigated the fraudulent loans.

In defense, Woods presented several character witnesses, then testified herself and denied any wrongdoing. Woods denied preparing and submitting loan applications for anyone else except Gilchrist, denied being paid $10,000 to submit Gilchrist's loan application, and denied supplying fraudulent information or creating false documents for any loan applications.

Woods did admit preparing loan applications for her own businesses. But Woods claimed that she submitted multiple loan applications with different information only because she was following the SBA's instructions to correct mistakes in earlier applications. She denied intending to defraud the government.

The jury found Woods guilty.

### E.    Sentencing

The presentence investigation report ("PSI") recommended: (1) a base offense level of 7, pursuant to U.S.S.G. §§ 2B1.1(a)(1) and 2X1.1(a); (2) a 14-level increase based on the intended loss amount (more than $550,000, but not more than $1,500,000), pursuant to § 2B1.1(b)(1)(H); (3) a 2-level sophisticated means increase, pursuant to § 2B1.1(b)(10)(C); (4) a 4-level leader or organizer role increase, pursuant to § 3B1.1(a); (5) a 2-level obstruction of justice increase, pursuant to § 3C1.1.  Her total offense level of 29 and criminal history category of I yielded an advisory guidelines range of 87 to 108 months' imprisonment.

Woods objected to the PSI's offense-level increases for the loss amount, sophisticated means, and role in the offense.  Woods withdrew her objection to the obstruction-of-justice increase.  Overruling Woods's objections, the district court found Woods's offense level was 29 and criminal history category was I, yielding an advisory guidelines range of 87 to 108 months.

The district court heard testimony from six favorable character witnesses, including Woods's family, friends and two pastors.  Taken together, they described how Woods overcame a difficult childhood, completed her college education while a single mother, attended law school, and became an attorney.  Both counsel presented arguments.  The government requested a sentence within the advisory guidelines range.

In mitigation, Woods pointed to the facts that: (1) she repaid her loans and completed 130 hours of community service since trial; (2) Parker, the only other conspirator to serve any time, already completed her 12-month sentence; (3) Woods had no criminal history; and (4) despite being born to a 16-year-old, drug-addicted mother, Woods "battled incredible odds" and, through courage and willpower, become an attorney. During her allocution, Woods emphasized that she could no longer be an attorney, described seeing her mother overdose on crack cocaine, and asked for mercy and to be "allowed to go home" to her children.

After stating that it had considered, "through the lens of [§] 3553(a)," the witnesses' testimony, counsels' arguments, the PSI, Woods's sentencing memorandum, and letters supporting Woods, the district court imposed a 75-month sentence. The district court explained that it varied downward from the advisory guidelines range of 87 to 108 months because the sophisticated means guidelines enhancement overrepresented the seriousness of Woods's offense and because Woods's culpability was "already reflected by the leader or organizer enhancement." The district court added:

> You know, sometimes the guidelines get it right; sometimes they get it wrong. *Here, this is the sentence I would give regardless of what the guidelines say.* But given that sophisticated means enhancement, I kind of had to step back from the guidelines and say what

Case 4:22-cr-00016-RSB-CLR    Document 418    Filed 07/21/25    Page 9 of 26
USCA11 Case: 24-11500    Document: 38-1    Date Filed: 05/14/2025    Page: 9 of 24

24-11500          Opinion of the Court                    9

is the appropriate sentence in this case, *regardless of
what the guidelines say*. When I think about the totality
of the circumstances, this is the sentence that I've
landed on as the appropriate sentence.

(Emphasis added.) The district court acknowledged that while the
sentence was below the advisory guidelines range, it was still a
"very serious sentence" that it "would give regardless of what the
guidelines say."

In explaining the chosen sentence, the district court referred
to Woods's history and characteristics, including her difficult
upbringing, her laudable achievements, and her supportive family
and friends. The district court stressed the seriousness of Woods's
offense, noting that Woods "stole from the American people's
benevolence during one of the darkest chapters in our nation's
history" and "took from the well that was meant to give water to
those who were truly suffering." The district court pointed out
that "it wasn't just an incident," rather "[i]t was a long scheme" that
"took a lot of actions," and "when you all were caught, you told
Courtney Gilchrist, don't worry, I'm going to come up with a
story."

The district court also emphasized Woods's trial testimony,
which had "sullied this courtroom . . . with falsehood after
falsehood after falsehood." The district court described Woods as
being "one of the worst liars" the court had seen, telling obvious
lies and doubling down on them in the face of the government's
contradictory evidence. The district court found Woods

committed "rampant perjury," rather than fulfill her duty of candor as a lawyer.

After the sentence, Woods did not object to the sentence or the manner in which it was imposed.

## II. VARIANCE FROM THE INDICTMENT

Woods argues the government's trial evidence proved multiple separate conspiracies and thus constituted a material variance from the indictment, which charged a single conspiracy.

We ordinarily review *de novo* whether a material variance occurred between the indictment's allegations and the evidence presented at trial. *United States v. Goldstein*, 989 F.3d 1178, 1198 (11th Cir. 2021). However, because Woods asserts her material variance argument for the first time on appeal, our review is for plain error. *See United States v. Wilson*, 788 F.3d 1298, 1312 (11th Cir. 2015).

### A.    Material Variance

A variance is not material if, viewing the evidence in the light most favorable to the verdict, a reasonable jury could have found beyond a reasonable doubt that a single conspiracy existed. *United States v. Calderon*, 127 F.3d 1314, 1327 (11th Cir. 1997); *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008). Three factors inform that inquiry: (1) whether a common goal existed; (2) the nature of the scheme underlying the crimes charged; and (3) the overlap of participants. *Richardson*, 532 F.3d at 1284.

As to the first factor, a jury reasonably could have found that the co-conspirators shared a common goal—falsifying applications to obtain PPP and EIDL loans—and each conspirator's actions facilitated the achievement of that goal.  *See Calderon*, 127 F.3d at 1327 (explaining to be "common," a goal need only be "similar or substantially the same rather than shared or coordinate").

"It is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy; all that the government must prove is an agreement or *common purpose* to violate the law and intentional joining in this goal by co-conspirators."  *United States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007) (quotation marks omitted and alterations adopted).  The jury reasonably could have inferred that these co-conspirators intentionally joined in the conspiracy's common goal and that Woods, as a "key man," directed, coordinated, and facilitated the venture as a whole.  *See Richardson*, 532 F.3d at 1284-85.

As to the second factor, the trial evidence amply supported a jury finding that the nature of the scheme was that Woods, with assistance from her co-conspirators, would submit falsified PPP and EIDL loan applications to the SBA or a third-party lender.  The co-conspirators assisted Woods by agreeing to be the applicant-owners of the sham businesses, by creating false documents that Woods submitted in support of the fraudulent loan applications, and by falsely communicating with the SBA, as directed by Woods, during the loan application process.

As to the third factor, trial evidence demonstrated a significant overlap of participants. For example, apart from the fact that Woods worked directly and significantly with the co-conspirators: (1) Woods and Bostick are married; (2) Woods, Parker, and Jackson are cousins; (3) Parker, who was Gilchrist's sorority sister in college and prepared Gilchrist's taxes, created a false Schedule C for Gilchrist's loan application at Woods's direction; (4) Woods and Gilchrist were friends and attended Florida Coastal Law School together; (5) Woods and Gilchrist both knew Smith, who worked at the law school; and (5) Childers, who was Bostick's and Woods's tax preparer, falsified tax documents at Woods's direction for loan applications by Woods, Jackson, and Bostick.

Based on the trial evidence of the loan-fraud conspiracy's common goal, underlying scheme, and overlap in participants, a reasonable jury could have found beyond a reasonable doubt that a single conspiracy existed. Thus, there was no material variance from the indictment, much less plain error.

We also reject Woods's argument that her scheme was a "hub-and-spoke" conspiracy, with herself as the "hub" and each co-conspirator as a wholly separate spoke, creating at least four different conspiracies. This ignores that all of the so-called spokes were relatives or friends of Woods, all were using the same type of false documents to make the same type of fraudulent loan applications, and often the co-conspirators even directly interacted on the same loan application.

For example, let's take COVID Trucking's EIDL application. Bostick was the listed owner, Woods incorporated the sham business and falsified the information in the application, Parker falsified a bank statement, and Childers created a fake 1099. Similarly, Parker also created falsified bank statements for Woods's and Gilchrist's loan applications. And Childers also created fake 1099 statements for herself, Jackson, and Woods. And, of course, Woods submitted false applications on behalf of herself, Bostick, Gilchrist, Smith, Coleman, and Jackson. The trial evidence revealed that the co-conspirators knew of each other's existence and had reason to know that they too were fraudulently receiving funds from the SBA. There was substantial evidence that the co-conspirators were aware of the nature and scope of Woods's scheme, significantly distinguishing this situation from a hub-and-spoke or rimless-wheel conspiracy. *See United States v. Seher*, 562 F.3d 1344, 1367 (11th Cir. 2009); *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004).

## B.  **Substantial Prejudice**

Our above determination that there was no material variance "necessarily ends our inquiry . . . ." *United States v. Alred*, 144 F.3d 1405, 1415 (11th Cir. 1998). Nevertheless, even if a variance arguably occurred, Woods's claim still fails. We will reverse a conviction based on a variance *only* if "the variance (1) was material *and* (2) substantially prejudiced the defendant." *United States v. Castro*, 89 F.3d 1443, 1450 (11th Cir. 1996) (emphasis added); *see also Wilson*, 788 F.3d at 1312 (quoting *United States v. Flynt*, 15 F.3d 1002, 1005 (11th Cir. 1994)). "[T]o show substantial

prejudice from a variance, a defendant must show that the proof at trial differed so greatly from the charges that he was 'unfairly surprised and was unable to prepare an adequate defense.'" *Wilson*, 788 F.3d at 1312 (quoting *Alred*, 144 F.3d at 1415); *United States v. Caporale*, 806 F.2d 1487, 1500-01 (11th Cir. 1986).

Here, the wire fraud conspiracy in Count 1 clearly charged Woods with preparing and submitting fraudulent loan applications for her businesses and those of her co-conspirators and enlisting her co-conspirators to create false documents and to make false representations to the SBA about the loan applications. The trial evidence established Woods was involved in all of the fraudulent loan applications. Woods could not have been surprised or unable to prepare an adequate defense. On appeal, Woods does not even contend that she was unfairly surprised or unable to prepare an adequate defense.

Rather, for the first time in her reply brief, Woods argues that, despite this Court's long-standing precedent requiring the defendant to show substantial prejudice in material-variance cases, the burden as to prejudice actually rests with the government, citing *Kotteakos v. United States*, 328 U.S. 750 (1946). Woods's *Kotteakos*-based argument fails for two independent reasons. First, we do not consider issues raised for the first time in a reply brief. *United States v. Magluta*, 418 F.3d 1166, 1185 (11th Cir. 2005); *United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004).

Second, and in any event, *Kotteakos* articulated the general harmless-error standard that applies "when the issue was properly

preserved by timely objection." *See United States v. Pon*, 963 F.3d 1207, 1227 (11th Cir. 2020). Here, however, our review is for plain error, meaning that Woods, not the government, must demonstrate prejudice to her substantial rights. *See Wilson*, 788 F.3d at 1312 (stating, on plain error review, that the defendant "fails to show a variance occurred that substantially prejudiced his rights"). As explained above, Woods has not shown substantial prejudice arising from any material variance.[2]

### III.  RULE 404(b) EVIDENCE

Woods challenges the district court's admission of co-conspirator Parker's testimony about a threat Woods made about co-conspirator Gilchrist.

### A.    Testimony Admitted

Co-conspirator Parker testified that once the FBI began investigating the loan applications, Woods told Parker she suspected Gilchrist "had someone on the phone with her" when

---

[2] In timely objection criminal cases, we apply harmless error review of nonconstitutional errors, which "requires reversal only if it resulted in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999) (quotation marks omitted); *Kotteakos*, 328 U.S. at 764-65. The government bears the burden to show the error was harmless under the *Kotteakos* standard. *Pon*, 963 F.3d at 1227; *Kotteakos*, 328 U.S. at 760-61. Even if a material variance arguably occurred and Woods had timely objected at trial, the trial evidence showed Woods was the key man and involved in all the fraudulent loan applications, and the government thus has shown any material-variance error was harmless.

Woods tried to talk with Gilchrist.  Later, Woods showed up at Parker's house, acted very nervous, patted Parker down for listening devices, and said she believed Gilchrist had told the FBI what they did.  Parker told Woods that she had spoken to the FBI and that the FBI knew everything about Woods.

After Parker took her daughter to cheer practice, Woods followed Parker to a Chick-Fil-A, where they spoke in Parker's car. Woods was upset with Gilchrist and believed Gilchrist "had set her up."  As to the threat, Parker testified as follows:

> Q. So I'll ask you again.  Was there ever a conversation between you and the defendant about whether something might happen to Courtney Gilchrist?
>
> A. Yes.  She talked about getting rid of Courtney. Not specifically her, but she felt like her sister's husband could have Courtney killed.
>
> Q. Now, were those her words?  What did she actually say?
>
> A. Get rid of her.
>
> Q. And how did you understand that?
>
> A. Kill her.  Get rid of her.

The district court admitted Parker's testimony pursuant to Federal Rule of Evidence 404(b).  We review the admission of evidence under Rule 404(b) for abuse of discretion.  *United States v. Culver*, 598 F.3d 740, 747 (11th Cir. 2010).

## B.    Rule 404(b) Principles

Under Rule 404(b), evidence of the defendant's other crimes, wrongs, or acts is not admissible to prove the defendant's character "in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

When a defendant pleads not guilty, her intent becomes a material issue, which the government may establish through qualifying Rule 404(b) evidence. *Edouard*, 485 F.3d at 1345. "[E]vidence that a defendant threatened a witness is relevant to show consciousness of guilt, a permissible purpose under Rule 404(b)." *United States v. Brazel*, 102 F.3d 1120, 1152 (11th Cir. 1997); *see also United States v. Fey*, 89 F.4th 903, 910-11 (11th Cir. 2023). Rule 404(b), however, does not apply to evidence that is intrinsic to the charged offenses. *United States v. Ford*, 784 F.3d 1386, 1393 (11th Cir. 2015).

Evidence of other bad acts, whether "inside or outside the scope of Rule 404(b), must still satisfy the requirements of Rule 403." *Fey*, 89 F.4th at 911. Testimony that the defendant sought to have a witness killed is not necessarily more prejudicial than probative. *Id.* at 913. The trial court must judge the threat's potential prejudice in the same manner as it would for other

potentially prejudicial evidence. *United States v. Gonzalez*, 703 F.2d 1222, 1223 (11th Cir. 1983).

## C.    Analysis

The district court did not abuse its discretion by admitting Parker's testimony about Woods's threat under Rule 404(b). As a threshold matter, we reject the government's contention that Parker's testimony about the threat was intrinsic evidence to which Rule 404(b) does not apply. Parker's testimony was extrinsic and within the scope of Rule 404(b). *See Fey*, 89 F.4th at 910-11. Woods's threat to "get rid of" Gilchrist, even if an attempt to conceal the fraud, was made *after* the conspiracy to obtain PPP and EIDL loans through falsified applications already was completed and was not part of the same transactions as the charged crime. *See id.* at 911.

Although extrinsic evidence, Parker's testimony was admissible under Rule 404(b). To be admissible under Rule 404(b), evidence of other bad acts must: (1) be relevant to an issue other than the defendant's character; (2) be sufficiently supported by proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s); and (3) possess probative value that is not substantially outweighed by undue prejudice and otherwise comply with Rule 403. *Edouard*, 485 F.3d at 1344. Rule 404(b) is a rule of "inclusion which allows extrinsic evidence unless it tends to prove only criminal propensity." *United States v. Sanders*, 668 F.3d 1298, 1314 (11th Cir. 2012) (quotation marks omitted). Accordingly, we view the disputed evidence "in a light most

favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006).

As to the first prong of the Rule 404(b) test, Parker's testimony about Woods's threat, which was prompted by Woods's fears that Gilchrist was cooperating with the FBI, showed Woods wanted to eliminate any possibility of the government finding out about their loan-fraud conspiracy. As such, evidence of Woods's threat to Gilchrist was relevant to show consciousness of guilt, knowledge of the criminal activity, and lack of mistake. *See Eduoard*, 485 F.3d at 1344; *Brazel*, 102 F.3d at 1152.

The second prong is also satisfied. Parker, an accomplice in the conspiracy who created falsified bank statements for Woods and other co-conspirators, provided sufficient proof of the extrinsic act to support the jury's conclusion that Woods threatened "to get rid of" Gilchrist in an attempt to cover up the conspiracy. Parker gave a detailed account of how Woods showed up at her house, patted her down, believed that Gilchrist set her up and told the FBI about the conspiracy, and how Woods followed Parker to her daughter's cheer practice and then to Chick-Fil-A before making the threat.

Woods describes Parker's testimony about the threat as "false" and "clearly improbable." But, in denying Woods's motion for a new trial, the district court determined that the government's cooperating witnesses were "remarkably credible." Furthermore, "the uncorroborated word of an accomplice . . . provides a

sufficient basis for concluding that the defendant committed extrinsic acts admissible under Rule 404(b)." *United States v. Dickerson*, 248 F.3d 1036, 1047 (11th Cir. 2001) (quotation marks omitted).

As for the third prong, the probative value of Parker's testimony is not substantially outweighed by its possible prejudicial effect. *See* Fed. R. Evid. 403. The evidence was highly probative of Woods's consciousness of guilt, knowing participation in the fraud scheme, and the absence of mistake. Evidence that Woods was upset and, in front of Parker, contemplated "[g]et[ting] rid of" Gilchrist after concluding Gilchrist was cooperating with the FBI's investigation undermined Woods's own trial testimony that she was entirely unaware of, and had nothing to do with, the fraudulent loan applications and false documents created to support them. While the evidence of Woods's threat was prejudicial, it was not unfairly so and was not more prejudicial than probative. *See Frey*, 89 F.4th at 913; *United States v. Nerey*, 877 F.3d 956, 976-77 (11th Cir. 2017).

## IV.  GUIDELINES CALCULATIONS

Woods argues the district court erred in calculating her advisory guidelines range as 87 to 108 months. She challenges the calculation of the loss amount under U.S.S.G. § 2B1.1(b) and the 4-level organizer-leader role increase under § 3B1.1(a). On appeal, the parties agree that if Woods's objections to the calculations had been sustained, her advisory guidelines range would have been 46 to 57 months' imprisonment. The district court's 75-month

sentence thus would have constituted an 18-month variance from the top of that range.

## A.   *Keene* Statement

The problem for Woods is that the district court, after imposing the sentence, stated three times that it would have imposed the same 75-month sentence regardless of the guidelines calculations.  Under our precedent, a guidelines calculation error is harmless when (1) the district court stated that it would have imposed the same sentence, even if it had decided the guidelines issue in the defendant's favor (sometimes called a *"Keene* statement"), and (2) assuming an error occurred and the lower guidelines range applied, the sentence is substantively reasonable. *United States v. Grushko*, 50 F.4th 1, 18 (11th Cir. 2022); *United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006).

Woods does not dispute that the district court made a *Keene* statement.[3]  And, as discussed below, the 75-month sentence was substantively reasonable.

## B.   **Substantive Reasonableness**

The substantive reasonableness of a sentence is measured based on the totality of the circumstances and considering the 18

---

[3] Woods argues *Keene* "represents the view of a substantial minority of the Circuits" and "should be abandoned by this Circuit."  Under our prior panel precedent rule, we are bound by *Keene*.  *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

U.S.C. § 3553(a) factors.[4]  *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc).  While "the district court has discretion to impose a sentence outside of the guideline range, a major variance requires a more significant justification than a minor one." *Grushko*, 50 F.4th at 20 (concluding, in a *Keene* statement case, that a 58-month upward variance from the defendant's alternative advisory guidelines range was substantively reasonable).  We do not presume that a sentence outside the advisory guidelines range is unreasonable.  *Id*.

The district court thoroughly explained why it chose a 75-month sentence "regardless of what the guidelines say."  The district court emphasized that: (1) Woods's offense was not a single incident of fraud, but rather "a long scheme," with many actions taken over a long period of time; (2) Woods's offense was "immoral" because she stole federal funds meant "to help real businesses" that were "truly suffering" survive the COVID-19 pandemic, one of the country's "worst economic disasters"; (3) once the conspirators were "caught," Woods told Gilchrist not

---

[4]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed education or vocational training or medical care; (6) the kinds of sentences available; (7) the sentencing guidelines range; (8) pertinent policy statements of the sentencing commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a).

to worry because Woods was "going to come up with a story"; (4) Woods repeatedly and blatantly lied during her trial testimony; and (5) by stealing from the American people and committing perjury in court, Woods violated the public trust and her duty of candor as a lawyer.

The district court's explanation was amply supported by the trial record and was more than sufficient to justify an 18-month upward variance. *See id.*

Further, the record belies Woods's claim that the district court "failed to recognize" her remarkable background and personal characteristics. The district court heard testimony from Woods's character witnesses, Woods's allocution, and the parties' arguments and explicitly considered Woods's sentencing memorandum, character letters, and the PSI, all of which together described in detail Woods's difficult childhood and how she overcame it to become a college graduate, a lawyer, a good mother to her children, and a valued member of her community. During the sentencing, the district court referred to Woods's background and positive personal characteristics several times. It noted that her witnesses spoke glowingly about her; that Woods "overcame so much," "attained a legal position," and had "been successful at everything [she had] done in [her] life"; and that Woods is "a good mother" who worked with the homeless. The district court agreed with Woods's pastor that "the dichotomy here is so difficult" because despite all the good things Woods did in her life, "in this crucible moment," she took "from the well that was meant to give

water to those who were truly suffering." There is no merit to Woods's claim that the district court "trivialized" or "fail[ed] to adequately consider" her history and characteristics.

## V. CONCLUSION

For these reasons, we affirm Woods's conviction and 75-month sentence.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

May 14, 2025

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  24-11500-AA
Case Style:  USA v. Shaquandra Woods
District Court Docket No:  4:22-cr-00016-RSB-CLR-1

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing. Among other things, **a petition for rehearing must include a Certificate of Interested Persons**. See 11th Cir. R. 40-3.

Costs
No costs are taxed.

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

<u>Clerk's Office Phone Numbers</u>

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion